# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

MICHELE MONTGOMERY on behalf of
T.C.B.,

                     **Plaintiff,**

-vs-                                **Case No.  6:10-cv-1772-Orl-19KRS**

COMMISSIONER OF SOCIAL
SECURITY,

                     **Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by

Michele Montgomery on behalf of her son, T.C.B., seeking review of the final decision of the

Commissioner of Social Security denying the claim for social security disability benefits for

T.C.B.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the

record before the Social Security Administration (SSA).  Doc. Nos. 10, 11.  This matter has been

referred to me for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Middle District of Florida Local Rule 6.01(c)(21).

## I.    PROCEDURAL  HISTORY.

In November 2007, Montgomery applied for disability benefits for T.C.B. under the

children's disability provisions of the Supplemental Security for the Aged, Blind and Disabled

program (SSI), 42 U.S.C. § 1381, *et seq.* (sometime referred to herein as the Act).  R. 91-93.  The

application alleged that T.C.B. became disabled on November 13, 2007.  *Id*.  Montgomery's claim

was denied initially and upon reconsideration.  R. 52-64.

Montgomery made a timely request for a hearing before an administrative law judge (ALJ). R. 65. An ALJ held a hearing on November 16, 2009. Montgomery and T.C.B., who were represented by an attorney, testified at the hearing. R. 27-47.

After considering the testimony and the medical records presented, the ALJ determined that T.C.B. had not engaged in substantial gainful activity since November 13, 2007, his alleged disability onset date. R. 13. She found that T.C.B had severe impairments, including a learning delay and speech delay. *Id.* The ALJ determined that these impairments did not meet or medically equal the criteria for any of the impairments listed in the applicable social security regulations (the Listings).[1] R.13.

Because the ALJ concluded that T.C.B.'s impairments did not meet any of the listed impairments, she proceeded to address whether T.C.B.'s impairments were functionally equivalent to the Listings under six domains of functioning, which are as follows: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.[2] R. 13-20.

---

[1] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[2] *See* 20 C.F.R. § 416.926a(b)(1).

The ALJ made the following findings under each domain.

(i) **Acquiring and Using Information**.  The ALJ found that T.C.B. had no limitations in this domain.  R. 16.

(ii) **Attending and Completing Tasks**.  The ALJ concluded that T.C.B. had less than marked limitations in this domain.  R. 17.

(iii) **Interacting and Relating with Others**.  The ALJ found that T.C.B. had less than marked limitations in this domain.  R. 18.

(iv) **Moving About and Manipulating Objects**.  The ALJ concluded that T.C.B. had no limitations in this domain.  R. 19.

(v) **Caring for Yourself**.  The ALJ concluded that T.C.B. had no limitations in this domain.  *Id.*

(vi) **Health and Physical Well-Being**.  The ALJ concluded T.C.B. had no limitations in this domain.  R. 20.

In reaching this decision, the ALJ gave significant weight to the opinions of William Prather, M.D., and Theodore Weber, Psy.D., both of whom reviewed T.C.B.'s records and talked to some of T.C.B.'s teachers.  They concluded that T.C.B.'s limitations did not functionally equal a Listing because he tested well above average in cognition despite low average scores in achievement and processing speed and because T.C.B. was making good progress in speech and language therapy.  R. 15.

The ALJ also found "the claimant" not to be not entirely credible regarding his impairments and the impact on his ability to function.  R. 15.

Because the ALJ concluded that T.C.B. did not have an extreme limitation in any one domain, or marked limitations in two domains, she concluded that T.C.B's impairments did not functionally equal a listed impairment.  R. 20; *see* 20 C.F.R. § 416.926a(d).  As such, the ALJ concluded that T.C.B. was not disabled.  R. 20.

Montgomery requested review by the Appeals Council, which request was denied.  R. 1-5. This timely appeal followed.  Doc. No. 1.

## II.    JURISDICTION.

Plaintiff having exhausted the administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## III.    STANDARD OF REVIEW.

The process for determining whether a child is disabled "begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case [the child] is considered 'not disabled' and is ineligible for benefits."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004) (quoting 20 C.F.R. § 416.924(a), (b)).  "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if [the child] has 'an impairment or combination of impairments that is severe.'"  *Id.* (quoting 20 C.F.R. § 416.924(a), (c)).  A "physical or mental impairment" under the terms of the Act is one that "result[s] from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques . . . ."  20 C.F.R. § 416.908.

If the child has a severe impairment, "the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child."  *Shinn*, 391 F.3d at 1278 (quoting 20 C.F.R. §§ 416.911(b), 416.924(d)).  "Limitations arising from pain count in this determination."

*Id*. (citing 20 C.F.R.§ 416.924(a)).  "The impairment must 'be expected to cause death or . . . [last]

for a continuous period of not less than [twelve] months.'"  *Id*. at 1279 (quoting 20 C.F.R. §

416.906)).

"A child's impairment is recognized as causing 'marked and severe functional limitations'

if those limitations 'meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings.'"  *Id.*

(quoting 20 C.F.R. § 416.911(b)(1); citing 20 C.F.R. §§ 416.902, 416.924(a)).  Limitations

appearing in the Listings are considered "marked and severe."  *Id*.

If the child's impairments do not meet or medically equal a listed impairment, "the ALJ can

still conclude that [the child's] limitations are 'functionally equivalent' to those in the Listings.  In

making this determination, the ALJ assesses the degree to which the child's limitations interfere

with the child's normal life activities."  *Id*.  The Code of Federal Regulations specifies six major

domains of functioning that the ALJ must consider:  (i) acquiring and using information; (ii)

attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and

manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.  20 C.F.R. §

416.926a(b)(1).  The regulations further provide benchmarks that children should have achieved

by certain ages.  20 C.F.R. § 416.926a(f)(3).

"A child's impairment is of [L]isting-level severity, and so functionally equals the

[L]istings, if as a result of the limitations stemming from that impairment the child has marked

limitations in two of the domains . . . , or an extreme limitation in one domain."  *Shinn*, 391 F.3d at

1279 (internal quotation marks and citation omitted).  A marked limitation in a domain exists when

the "impairment(s) interferes seriously with [the child's] ability to independently initiate, sustain,

or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An extreme limitation in a domain exists

when the "impairment(s) interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). In considering the severity of an impairment, the Commissioner may consider the effect of treatment, including medication. 20 C.F.R. § 416.924a(b)(9).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court

will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

## IV.    STATEMENT OF FACTS.

After thorough review of the record, I find that the relevant facts are adequately stated in the ALJ's decision and the parties' memoranda.  Therefore, I will only summarize the record to protect T.C.B.'s privacy to the extent possible.

T.C.B. was born in June 2001.  R. 91.  Alfonso Mireles, M.D., and Antonio Carcamo, M.D., at Progressive Pediatrics treated T.C.B.  At the five-year-old check-up, T.C.B. was noted as "failure to thrive."  His development was delayed for his age and further testing was recommended to rule out hydrocephalgia (water on the brain).  R. 185.  At the six-year-old check-up, Dr. Mireles noted that T.C.B. completed almost all of the developmental tasks, including counting on his fingers, recognizing the alphabet, printing letters, reading for pleasure and playing active games. R. 233.

Jennifer Rito, a school psychologist, evaluated T.C.B. in October 2007, at the beginning of T.C.B.'s second year in kindergarten.  R. 189.  His teacher from his first year in kindergarten reported that T.C.B. had difficulty focusing and staying seated during large group activities and sometimes would lie down on the floor.  When directly asked a question, he was often unresponsive and appeared to not understand the question.  In reading groups, he had difficulty tracking print and following along while others were reading.  He required individual adult

attention to complete most work. Various educational intervention techniques had not been effective. *Id.*

In her meetings with T.C.B., Dr. Rito observed that he was friendly, willingly participated in all testing activities and engaged in age-appropriate conversation, although he had difficulty answering questions appropriately. He took a considerable amount of time to process information and answer questions. R. 189-90. Testing revealed that T.C.B. scored in the 75th percentile, the above average range, for intellectual functioning. On the Young Children's Achievement test, he tested below average in general information and mathematics. He scored in the average range in reading and writing and scored in the low range in speaking. R. 191, 202. He scored in the average range for long term and short term retrieval of information. He scored in the 14th percentile for processing speed. Overall, testing showed that T.C.B. functioned in the above average range of measured intelligence with significant discrepancies between his intelligence and academic performance in reading, math and written language. R. 192, 203.

A Speech-Language Assessment completed on November 12, 2007 showed areas of concern in syntax, semantics and pragmatics. T.C.B. demonstrated weaknesses in expressive and receptive language skills. His syntax scores were below what was expected for his age. He used substitutions for the /v and th/ phonetic sounds, which were considered developmental. T.C.B. met the criteria for the language impaired program. R. 206. The school then notified Montgomery that T.C.B. was eligible for exceptional student educational services based on his learning disability and language impairment and a plan was established with the school. R. 207-12.

The school prepared an individual education plan (IEP) for T.C.B. on November 14, 2007. R. 209-12.  The form reflects that T.C.B. was "extremely slow at his work and often needs additional time to complete assignments and process the teacher's directions."  R. 209.

On January 8, 2008, Carla Ritchie, M.S., CCC-SLP, completed a Speech-Language Questionnaire.  R. 195-97.  She noted that T.C.B. passed a hearing screening on April 5, 2007.  She observed that T.C.B. was language impaired but was in therapy ninety minutes per week.  His prognosis for therapy was good but he had not been in therapy long.  He did not have any speech problems.  R. 195.  T.C.B. had weaknesses in syntax, including understanding and using plurals and verb tense.  In the area of semantics, he had difficulty with labeling opposites and comparing/contrasting.  R. 196.  He had demonstrated weaknesses in syntax, semantics and pragmatics.  R. 197.

Linda J. Hoffman, the school counselor, completed a request for administrative information on January 15, 2008.  She indicated that T.C.B. had a language disability and that he was receiving language therapy.  She noted that he scored in the 9th percentile for math and the 32nd percentile in written language.  R. 198.  For the period August to October 2007, Ms. Hoffman noted that T.C.B. had difficulty with large group instruction due to his trouble focusing.  He wrote random letters, appeared not to understand questions, knew few sight words and had difficulty completing his work independently.  As of November 2007, he was slower to complete assignments but was able to complete them independently.  He was able to stay on task more.  He knew all of his letter sounds in isolation but he had difficulty blending sounds to form words.  His eyes did not focus together consistently.  There was a severe discrepancy between his above average intellectual

ability and his achievement in reading, written language and math and his difficulty in processing speech. He also had deficits in semantics, syntax and pragmatics. R. 199.

T.C.B.'s kindergarten teacher, Carly Nugent, completed a teacher questionnaire on January 22, 2008. She indicated that T.C.B. had an obvious problem expressing ideas in written form, and a slight problem in comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, providing organized oral explanations and adequate descriptions, learning new material and applying problem-solving skills in class discussions. She noted he went to learning disability classes (SLD) sixty minutes per day and was provided extra time to finish his work. R. 119.[3] Under attending and completing tasks, she noted T.C.B. had a daily and obvious problem paying attention when spoken to directly, sustaining attention during play/sports activities, refocusing to task when necessary, carrying out multi-step instructions, organizing his own things or school materials, completing class/homework assignments, and working at a reasonable pace/finishing on time. She indicated he had a slight daily problem with focusing long enough to finish an assigned activity or task, carrying out single-step instructions, changing from one activity to another without being disruptive, and working without distracting himself or others. She noted he had trouble in P.E. with three classes together. R. 120. Under interacting and relating with others, she indicated he had a slight daily problem with following rules and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. R. 121. He had no problems moving about and manipulating objects. R. 122. He

---

[3] The form used by the teachers contains five functional ratings: no problem; a slight problem; an obvious problem; a serious problem; and a very serious problem. *See, e.g.,* R. 119.

had no overall problems caring for himself but had a slight problem knowing when to ask for help. R. 123.

On February 4, 2008, Ira Pinellas, M.D., and Pamela D. Green, Ph.D., completed a Child Disability Evaluation Form based on a review of T.C.B.'s records. They noted that T.C.B. had a combination of impairments that was severe but did not meet, medically equal or functionally equal the Listings. R. 213. He had no limitations in acquiring and using information, moving about and manipulating objects, caring for himself, and in his health and well being. R. 215-16. He had less than marked limitations in attending and completing tasks and interacting and relating with others. R. 215.[4]

On May 8, 2008, William Prather, M.D., and Theodore Weber, M.Div., Psy.D., completed a Child Disability Evaluation Form. They found that T.C.B.'s impairments were severe but did not meet, medically equal or functionally equal the Listings. R. 220. They found that T.C.B. had less-than-marked limitations in acquiring and using information, attending and completing tasks and interacting and relating with others. R. 222. They found no limitations in moving about and manipulating objects, caring for himself or his health and physical well being. R. 223.

T.C.B. had his seven-year-old examination on June 19, 2008. Dr. Carcamo indicated that T.C.B. failed AD hearing screen. R. 230.

Cindy M. Irwin, T.C.B.'s first grade teacher, filled out a teacher questionnaire on September 25, 2008. R. 161-68. She indicated T.C.B. was reading and writing below level but

---

[4] Also on February 6, 2008, Carole Hardiman, M.S., CCC-SLP, completed a report of contact and indicated that T.C.B. had less than marked limitations in language as evaluated in Domain 1 and no limitations in speech as rated in Domain 3. R. 219. It is not clear what information Ms. Hardiman relied on to make this assessment.

performing math on level. His grade level was 0.8 to 1.0. He participated in SLD reading daily. R. 161. Under acquiring and using information, she noted that T.C.B. had an obvious problem reading and comprehending written material, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form and learning new material. He had a slight problem comprehending oral instructions, understanding school and content vocabulary, comprehending and doing math problems, recalling and applying previously learned materials and applying problem-solving skills in class discussions. He had difficulty staying on task and focusing which kept him from completing his assignments. R. 162. In the area of attending and completing tasks, she noted he had a very serious problem hourly in paying attention when spoken to directly, focusing long enough to finish an assigned activity or task, refocusing to task when necessary, carrying out multi-step instructions, organizing his own things or school materials, completing class or homework assignments, working without distracting himself or others and working at reasonable pace/finishing on time. He had an obvious problem with sustaining attention during play/sports activities, carrying out single-step instructions and completing work accurately without careless mistakes. He often moved around a lot and acted as if he were flying or surfing. R. 163. He had no problems interacting or relating to others. R. 165. He also had no problems moving about and manipulating objects or caring for himself. R. 165-66.

At his eight-year-old physical examination on August 7, 2009, Dr. Carcamo noted that T.C.B. had failed a hearing screen. Dr. Carcamo diagnosed a speech delay/learning disability. He also wanted testing to rule out hydrocephaglia. R. 227. A brain CT scan on October 26, 2009 was normal. R. 234.

Jasna Kojic, M.D., FAAP, a child neurologist, evaluated T.C.B. on November 5, 2009 for developmental issues and headaches. R. 239-41. Montgomery reported that she sometime saw a vision disorder in which both eyes could not be directed at the same object at the same time (strabismus). R. 239. T.C.B. complained of headaches daily. He had low muscle tone in his lower jaw and occasionally drooled. He had significant snoring. R. 239. Upon examination, Dr. Kojic observed that T.B.C.'s tonsils were significantly enlarged and he was unable to breathe through his nose. She observed some drooling. His speech was mildly hypophonic and dysarticulate. Dr. Kojic's impression was long-standing history of developmental issues, possibly due to a hypoxic event at birth, and possible sleep apnea which could affect his learning and trigger his headaches. R. 240. Dr. Kojic recommended additional testing, including a sleep study to test for sleep apnea. R. 241. An EEG test on November 9, 2009 was normal. R. 242.

At the ALJ's hearing, Montgomery testified that T.C.B. could not sit still and had to be moving. R. 29-30. He tilted his head to see but did not need glasses. R. 30. He did not run and play or do well in PE because he had trouble breathing. R. 31. He fainted while he was running at home because he could not get enough air. R. 35-36. He frequently complained of headaches. R. 36. Montgomery stated that T.C.B. was smart and could answer questions in a one-on-one setting. However, he could not follow instructions without coaching; she had to tell him multiple times to do things because of his difficulty processing the request. R. 33, 35. He did not follow instructions as well as his younger six-year-old brother did. R. 41. Sometimes she would have to show him physically what she wanted him to do. R. 37. He could not write a paragraph. He could comprehend what he read and answer specific questions about what he read, but he could not summarize it on his own. R. 33. She had to help him do his homework and class work that he did

not finish.  Sometimes he complained that he could not pick up the pencil and could not write.  R. 38.  It took him a long time to complete his assignments.  R. 38-39.  He had difficulty learning new things and it took him longer to learn new things than the other children.  R. 39-40.  He drooled as well.  R. 43-44.

T.C.B. testified that he played with his friends at school.  R. 44.  He would play and fight with his little brother.  R. 45.  He responded to the questions asked, although he asked "What?" in response to two questions.  R. 44-45.

## V.    ANALYSIS.

Montgomery asserts three grounds supporting reversal.  First, she contends that the ALJ erred by failing to conclude that T.C.B. has marked or extreme limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.  Montgomery also argues that the ALJ erred in giving significant weight to the opinion of a non-examining State consultant and failing to state the weight given to opinions of teaching professionals.  Lastly, Montgomery contends that the ALJ failed to apply the correct legal standards in evaluating her testimony and T.C.B.'s testimony.  These are the only issues I will address.[5]

> A.    *Whether Substantial Evidence Supports the ALJ's Findings*
> *Regarding Domains of Function.*

Montgomery argues that the ALJ erred in failing to find that T.C.B. has at least marked limitations in the functional areas of attending and completing tasks, acquiring and using information, and interacting and relating to others.  A child has a marked limitation when his

_____

[5]  The parties were advised that issues not specifically raised would be waived.  Doc. No. 12.

impairment interferes seriously with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A child has an extreme limitation when his impairment interferes very seriously in his ability to independently initiate, sustain or complete activities. *Id.* § 416.926a(e)(3)(i).

        1.    <u>Attending the Completing Tasks</u>.

This domain considers how the child is able to focus, maintain attention, and, begin, carry through and finish activities, including the pace the child performs activities and the ease with which the child changes activities. 20 C.F.R. § 416.926a(h). School-age children, those between ages 6 and 12, should be able to do the following:

> focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

*Id.* § 416.926a(h)(2)(iv). The SSA regulations give the following examples of limited functioning in attending and completing tasks:

> (i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.

> (ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.

> (iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.

(iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

(v) You require extra supervision to keep you engaged in an activity.

*Id.* § 416.926a(h)(3).

Montgomery contends that the following evidence shows at least a marked impairment in this area:

a.　After psychological tests administrated in 2007, T.C.B. scored in the 14th percentile in processing speed, which represented "a significant weakness for [him]... a weakness in this area may make it difficult for him to work quickly, to perform under time limits, and to understand sequences of directions." R. 192.

b　An Individual Education Plan prepared in November 2007 indicated that he was "extremely slow at his work." R. 209.

c.　T.C.B's teacher in his second year of kindergarten, Ms. Nugent, wrote that T.C.B. had "obvious problems" paying attention when spoken to directly, sustaining attention during play/sports activities, refocusing to task when necessary, carrying out multiple-step instructions, organizing his own things or school materials, completing class/homework assignments, and working at a reasonable pace or finishing on time. R. 119-20.

d.　Ms. Nugent also opined that "[T.C.B.] had difficulty completing independent work . . . [he] required individual adult attention to complete most work." R. 189. He was also given extra time to finish his work every day. R. 119. T.C.B.'s guidance counselor wrote in January 2008 that T.C.B. had difficulty completing work independently and staying on task. R. 199.

e.　T.C.B.'s first grade teacher, Ms. Irwin, opined that T.C.B. has "very serious" problems paying attention when spoken to directly, focusing long enough to finish assigned activity or task, refocusing to task when necessary, carrying out multiple-step instructions, organizing his own things and school materials, completing class/homework assignments, working without distracting self or others and working at a reasonable pace or finishing on time; and "obvious problems" in reading and comprehending written material,

> understanding and participating in class discussions, providing
> organized oral explanations and adequate descriptions, expressing
> ideas in written form, learning new material, sustaining attention
> during play/sports activities, carrying out single-step instructions,
> and completing work accurately without careless mistakes. R. 162-
> 63.

In the domain of attending and completing tasks, the ALJ found that T.C.B. had a less-than-marked limitation. However, the teacher's opinions that T.C.B. had extreme difficulties and very serious problems are consistent with the definition of an extreme limitations. *See, e.g.,* 20 C.F.R. § 416. 926(e)(3)(i) ("We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. . . .").

The ALJ gave significant weight to the opinion of the Drs. Prather and Weber who opined in May 2008 that T.C.B. had less-than-marked limitations in this domain. R. 15. These physicians based their opinions, in part, on interviews with two teachers, who reported as follows:

> Kimberlay (ESE) stated there have been no changes since completion of first TQ.
> [T.C.B.] does attend spec ed classes along with regular classes. He still takes extra
> time to finish tasks but does in fact finish. He gets on well with classmates. He is
> polite and minds his business. He is mindful of rules and regulations and shows
> respect for teachers and staff.

> Carla (SL) states SL progress is positive. [T.C.B.] is doing well and shows good
> motivation and effort. He is compliant with what is requested of him. He gets
> along well with students and staff alike.

R. 225. However, Dr. Prather and Dr. Weber's opinion was rendered before T.C.B.'s first grade teacher wrote that T.C.B. had a very serious problem in this domain.

The ALJ did not explain why she disregarded the opinion of T.C.B.'s first grade teacher regarding very serious limitations in the domain of attending and completing tasks. Because the

ALJ cannot select only portions of the record that support the conclusion while failing to explain why other contrary portions of the record were not credited, the record is insufficient to determine whether the ALJ's decision in this domain is supported by substantial evidence and based on correct application of the law. *See, e.g., Jackson ex rel. K.J. v. Astrue*, 734 F. Supp. 2d 1343, 1369-70 (N.D. Ga. 2010).

Because there is some evidence that T.C.B. may have an extreme limitation in this domain, remand is required to permit the Commissioner to reassess T.C.B.'s limitations in this domain and to explain the basis for that assessment in light of all of the evidence in the record.

2.      Acquiring and Using Information.

This domain considers how well a child acquires and learns information and how well the child used the information learned. School-age children should be able to do the following:

> [Y]ou should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv). The SSA regulations give the following examples of limitations in this domain:

> (i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.

> (ii) You cannot rhyme words or the sounds in words.

> (iii) You have difficulty recalling important things you learned in school yesterday.

(iv) You have difficulty solving mathematics questions or computing arithmetic answers.

(v) You talk only in short, simple sentences and have difficulty explaining what you mean.

*Id.* § 416.926a(g)(3).

Montgomery argues that the following evidence shows that T.C.B. has marked limitations in this domain:

His kindergarten teacher opined that: "When directly asked a question, [he] was often unresponsive and appeared to not understand the question. When he did respond, the answer was frequently unrelated to the topic. In reading groups, [he] had difficulty tracking print and following along while others were reading." (Tr. 189).

Ms. Irwin felt that T.C.B. has an "obvious problem in reading and comprehending written material, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, sustaining attention during play/sports activities, carrying out single-step instructions, and completing work accurately without careless mistakes. (Tr. 162-163).

T.C.B. scored in the low 14 percentile in processing speed, which was noted to represent "a significant weakness for [him]... a weakness in this area may make it difficult for [him] to work quickly, to perform under time limits, and to understand sequences of directions." (Tr. 192).

T.C.B.'s teacher felt that he had an "obvious problem" expressing ideas in written form. (Tr. 119).

Dr. Mireles diagnosed a failed hearing screen and speech delay/learning disability. (Tr. 227).

Doc. No. 15 at 9-10.

The ALJ found that T.C.B. had no limitations in this domain. R. 16. She supported that decision by noting that T.C.B. passed a hearing screening on April 5, 2007 and that his prognosis was good. She also indicated that there was no evidence that T.C.B. suffered from a speech

-19-

disorder.  R. 15.  Additionally, the ALJ noted that T.C.B. was making good progress in speech and language therapy and that his test scores showed he was well above average in cognition despite his low processing speed.  *Id.*  The ALJ also gave significant weight to the opinion of Drs. Prather and Weber.  These doctors opined, however, that T.C.B. had less-than-marked limitations in this domain.  R. 222.

Once again, the ALJ cites to some evidence in the record in support of her finding without explaining the weight given to contrary evidence.  T.C.B. did pass a hearing screening in 2007, when he was five years old.  Thereafter, the record reflects that he failed a hearing screening.  When T.C.B. was seven years old, Dr. Carcamo diagnosed a speech delay/learning disability for which T.C.B. received special treatment.  His first grade teacher indicated that while T.C.B. had improved in many areas, he still had an obvious problem reading and comprehending written material, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form and learning new material.  Because the ALJ did not address this evidence in reaching the finding that T.C.B. had no limitation in this domain, the record is insufficient for the Court to determine whether the ALJ's decision as to this domain is supported by substantial evidence and based on correct application of the law.

　　　　3.　　　Interacting and Relating to Others.

This domain addresses how well the child initiates and sustains emotional connections with others, responds to criticism, and cooperates with others, among other things.  20 C.F.R. § 416.926a(i).  School-age children should be able to do the following:

[Y]ou should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

*Id.* § 416.926a(i)(2)(iv). The SSA regulations give examples of limitations in this domain as follows:

(i) You do not reach out to be picked up and held by your caregiver.

(ii) You have no close friends, or your friends are all older or younger than you.

(iii) You avoid or withdraw from people you know, or you are overly anxious or fearful of meeting new people or trying new experiences.

(iv) You have difficulty playing games or sports with rules.

(v) You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.

(vi) You have difficulty speaking intelligibly or with adequate fluency.

*Id.* § 416.926a(i)(3).

Montgomery contends that T.C.B. has marked limitations in this domain based on a number of factors including that he had disarticulate speech, weaknesses in expressive and receptive language skills, and scored in the low range of the ability to communicate orally.

The ALJ concluded that T.C.B. had less-than-marked limitations in this domain. The ALJ acknowledged the evidence that T.C.B. had difficulty expressing himself, but she noted that his prognosis was good with continued language therapy. Drs. Prather and Weber concurred that T.C.B.'s limitation in this domain was less than marked. The ALJ addressed the evidence of limitations in this domain and explained why she concluded that T.C.B. had limitations in this

domain, but that those limitations were less than marked. This finding is supported by substantial evidence in the record. Accordingly, I recommend that the Court find that the ALJ did not err in the finding related to this domain.

   B.      *Weight Given to Opinions of Medical and Other Professionals.*

   Montgomery argues that the ALJ erred by giving significant weight to the opinion of Drs. Prather and Weber and by failing to state the weight given to opinions of teaching professionals and the psychoeducational report prepared by Dr. Rito.

   The Commissioner correctly observes that under the SSA regulations an ALJ may give great weight to the opinions of physicians review the claimant's records if their opinions are supported by evidence of record. *See* 20 C.F.R. § 416.927(f)(2)(i). As discussed above, Drs. Prather and Weber did not have all of the evidence currently before the Court available to them when they rendered their opinion. Accordingly, the Commissioner must evaluate that opinion in light of subsequent evidence received.

   It is also appropriate to require the ALJ to state the weight given to the evidence and opinions of educational professionals, including T.C.B.'s teachers, guidance counselors and Dr. Rito. Regarding a child's disability claim, the SSA regulations provide that information from nonmedical sources, including parents, teachers and people who know the child will be considered. 20 C.F.R. § 416.924a; *Green v. Comm'r*, No. 6:09-cv-1936-Orl-28DAB, 2010 WL 4941425, at * 3-4 (M.D. Fla. Oct. 27, 2010), *adopted* Case No. 09-cv-1936-Orl-28DAB, Doc. No. 18 (M.D. Fla. Nov. 29, 2010); *see also Shinn*, 391 F.3d at 1285 (holding that ALJ must consider testimony of child's mother).

   C.      *Testimony from T.C.B. and Montgomery.*

Montgomery argues that the ALJ erred by failing to consider her testimony. In *Shinn*, the Eleventh Circuit held that an ALJ must consider a mother's testimony in a child disability case. 391 F.3d at 1285. The ALJ followed this legal requirement. She summarized Montgomery's testimony and contrasted it with other record evidence. R. 14-15.

Montgomery also contends that the ALJ erred by finding T.C.B.'s testimony not credible. It is not clear whether the ALJ's findings that "the claimant is not credible regarding his alleged impairments and [their] impact on his ability to function," R. 15, refer to T.C.B.'s testimony specifically or to the basis of the SSI application was a whole. On remand, the Commissioner should clarify this credibility finding to give a reviewing Court sufficient information to evaluate whether it is based on substantial evidence and correct application of the law.

      D.     *Remand For Further Proceedings or an Award of Benefits.*

Because further analysis of T.C.B.'s limitations in two domains of functioning and other clarification is required, this is not a case "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Rather, remand for further proceedings is warranted.

## VI.    RECOMMENDATION.

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **REVERSED** under sentence four of 42 U.S.C. § 405(g), and **REMANDED** for further proceedings consistent with the Court's order. I further recommend that the Court direct the Clerk of Court to issue a judgment consistent with its order on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** in Orlando, Florida on January 11th, 2012.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy